FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

NOV 2 3 2005

at 4 o'clock and 06 min. ⟶ M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. No. 05-00221 SOM |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER DENYING DEFENDANT'S |
| vs. | ) | MOTION TO SUPPRESS |
| | ) | |
| ALVARO VARELA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

I.      INTRODUCTION.

Defendant Alvaro Varela seeks suppression of evidence
of child pornography obtained by the Government through Limewire,
a computer file-sharing program.  Limewire allows members of the
public to access each other's computer files over a network of
other Limewire users.  Varela argues that the evidence obtained
from his computer should be suppressed because the Government's
use of Limewire to determine what was on his computer and the
Government's identification of him as the computer owner
constituted warrantless searches.  Because Varela had neither a
subjective nor an objective expectation of privacy in the child
pornography computer files he willingly made available to all
persons using Limewire, no warrant was necessary.  Additionally,
because the Government complied with applicable law in obtaining
from Road Runner, the internet service provider, information
identifying Varela as the person using the computer, and because

it is the internet service provider, not Varela, that has standing to challenge the procedure the Government used, the court denies Varela's request that this court suppress evidence obtained from Road Runner, as well as any fruit of that evidence.

Varela also seeks suppression of statements he made, as well as fruits of those statements, arguing that he did not properly receive <u>Miranda</u> warnings and that the Government's questioning of him was unreasonable. The court disagrees with Varela and declines to suppress his statements.

II.    <u>ANALYSIS.</u>

A.    <u>Findings of Fact.</u>

In an effort to rule promptly on the merits and to avoid the burden on the court's overextended court reporters, the court did not request, and therefore does not have, final transcripts of the live testimony, although the court has "rough" unedited copies of those transcripts. Therefore, in referring to that testimony in these findings of fact, this court is unable to give exact page and line citations to the testimony. Based on the testimony and the evidence presented to this court, the court finds the following by a preponderance of the evidence.[1]

---

[1] To the extent any finding of fact should more properly be designated a conclusion of law, it should be treated as a conclusion of law. Similarly, to the extent any conclusion of law should more properly be designated a finding of fact, it should be treated as a finding of fact. For ease of reference to particular findings and conclusions in later proceedings, if any, the findings and conclusions are presented in numbered paragraphs.

1.    In a discussion with the court to determine what evidence was in dispute and so had to be introduced at the hearing on this motion, the parties agreed that no dispute existed as to how the Government determined that Varela was allegedly sharing child pornography over Limewire.  Without objection from Varela, Special Agent ("SA") Paul Akeo of the Immigration and Customs Enforcement ("ICE") office located in Honolulu, Hawaii, adopted as his testimony the statement of facts contained in the Government's memorandum opposing Varela's motion, although SAs Akeo and Kenneth Rochford, an ICE agent working in Douglas, Arizona, also credibly testified at the hearing.  The only evidence Varela initially disputed was whether it was possible for the Government to have determined the Internet Protocol ("IP") address of the computer allegedly sharing the child pornography by using Limewire.[2]  However, after SA Rochford testified that such a determination was possible using computer functions available to all Limewire users, Varela abandoned that issue.  In any event, the court was not presented with any evidence indicating that a member of the public could not have determined the IP address of the computer sharing the

_____

[2] For a computer to access the Internet, it must have an IP address.  Internet Service Providers ("ISPs"), such as Road Runner, own blocks of IP addresses and assign them to account holders each time they access the Internet.  An IP address, which changes each time a computer accesses the internet using an ISP like Road Runner, is therefore unique to a particular computer at a particular time.  See, e.g., Sony Music Entertainment Inc. v. Does 1-40, 326 F. Supp. 2d 556, 559 (S.D.N.Y. 2004).

child pornography by using publicly accessible Limewire functions.

2.    With the parties' agreement, the court received evidence regarding the voluntariness of Varela's statements and whether he had properly waived his Miranda rights before he made the statements.  The court therefore received testimony from SA Akeo, Varela, and his wife, Michelle Ann Villanti.  The court received into evidence Exhibit 1 (a photograph of the room in which Varela was interviewed) and Exhibit 2 (a statement of rights form initialed by Varela and a waiver of rights form signed by Varela).  The court also received into evidence Exhibit B (the application for search warrant) and Exhibit C (the search warrant), both attached to the Government's memorandum.

3.    SA Rochford used a publicly available program called "Limewire" to investigate child pornography being shared over the Internet.  As SA Rochford explained, Limewire is a program that allows "peer-to-peer" file-sharing via a network of Limewire users.  Users of Limewire make electronic files on their computers (such as pictures, music, videos, and programs) available to other Limewire users.  A Limewire user can search the files made available by other Limewire users and, if the user locates a file he or she wishes to have, may "download" that file.  That is, the user may transfer to his or her own computer

an exact copy of the electronic file on the other person's computer.

4.   On January 7, 2004, SA Rochford input the term "preteen" into Limewire's search engine to investigate the sharing of child pornography.  This computer search yielded a list of files that were being shared, one of which was a video with the name "Pedofilia 10 aO-as anal."  Using functions available to any Limewire user, SA Rochford determined that the file was being shared by a computer using IP address 66.91.1.42.

5.   SA Rochford downloaded the "Pedofilia 10 aO-as anal" file from that IP address and found that it showed an undeveloped girl bending over and being anally penetrated by an adult male.

6.   SA Rochford testified that, after he had watched that video file, he used his mouse to point and click on the "Browse Host" feature offered by Limewire.  Doing this gave him a list of all the files being shared by the computer with IP address 66.91.1.42.  It turned out that the computer with IP address 66.91.1.42 was sharing 3,000 files, some with sexually explicit titles, such as "r@ygold 8yo ballerina fuck (1)," "BabyJ bro cums on lips," "pedo mom R@YGOLD," and "pedo year 3 old kid." SA Rochford downloaded these files from the computer with the IP address 66.91.1.42 and saw that they were videos of minors engaged in sexually explicit conduct, including oral and vaginal sex.

7.    SA Rochford then accessed the American Registry for Internet Numbers[3] to identify which ISP owned IP address 66.91.1.42.  The registry indicated that the IP address was owned by Road Runner and used in Hawaii.

8.    On January 8, 2004, SA Rochford served a United States Customs Service summons on Road Runner, seeking the subscriber information for the account using IP address 66.91.1.42 on January 7, 2004, at the time of the downloads. Road Runner responded that the account was owned by Varela, whose address was 945 Pulehuiki Road, Kula, Hawaii 96790.

9.    SA Rochford forwarded his investigative file to ICE in Honolulu, Hawaii, where SA Paul Akeo reviewed it and confirmed that Varela lived at the Pulehuiki address.  On March 10, 2004, SA Akeo applied for a search warrant for Varela's residence.  See Exhibit B.  Magistrate Judge Barry M. Kurren issued the requested search warrant that same day, finding probable cause to believe that evidence of possession and distribution of child pornography would likely be found at Varela's residence.  See Exhibit C.

10.    On March 17, 2004, at approximately 6:03 a.m., SA Akeo and SA Brandon Jim On were among eleven agents who executed the search warrant.  Wearing plainclothes and bullet

---

[3] The American Registry for Internet Numbers is available at www.Arin.net.  The website has a "Search WHOIS" feature into which a user may input an IP address to identify which ISP is its owner.

proof vests, SAs Akeo and Jim On knocked on the front door of Varela's residence. They were armed, but their weapons were holstered. David Villanti ("David"), Varela's seventeen-year-old stepson, answered the door, and SAs Akeo and Jim On identified themselves and told him that they were there to execute a federal search warrant. The agents asked David who else was in the house, and David replied that Michelle Villanti, his mother and Varela's wife, was there, but that Varela was at work at a hospital.

11.    SAs Akeo and Jim On then entered the house. SA Akeo stayed with David, while SA Jim On went to see Ms. Villanti, who was in her bedroom. SA Jim On told Ms. Villanti that he was executing a search warrant and that more would be explained to her once the house was secured. Ms. Villanti appeared to be ill and did not ask any questions. SA Jim On remained outside of Ms. Villanti's bedroom, near the doorway, while other agents swept the house for other persons and possible dangers and prepared for the search by photographing the residence and labeling each room.

12.    While the agents were preparing for the search, SA Akeo called Varela at Maui Memorial Hospital, where Varela worked as a nurse. Up to this point, the facts are undisputed. Many of the facts were included in the Government's memorandum and adopted on the witness stand by SA Akeo. It is

only at the point of contact between SA Akeo and Varela that a factual dispute arises.

13. SA Akeo testified that he told Varela over the phone that agents were executing a search warrant at his home, and that David and Ms. Villanti were present. SA Akeo said that he told Varela that Varela was welcome to return home, but not required to do so. SA Akeo said that Verela wanted to return home, but had to check with his supervisor first.

14. Varela testified that, when he first received the call from SA Akeo, he thought the call was a joke. Varela said that he told SA Akeo that he was going to hang up, but that SA Akeo said that he was not joking and that "we have your wife." Varela testified that his wife then got on the phone, sounded frightened, and said that SA Akeo was not joking and that Varela should come home. According to Varela, SA Akeo ordered him to return home. Varela's wife similarly testified that she heard SA Akeo tell Verela that he needed to come home right away. She also said that she heard SA Akeo tell Varela that he was not joking and that "we have your wife here." Ms. Villanti testified that, when SA Akeo put her on the telephone with Varela, she told him that SA Akeo was not joking and that he needed to come home.

15. The court believes SA Akeo's statement that he told Varela that he could return home but did not have to. The court is not persuaded that SA Akeo ordered Varela to return

home.  Having agents search their home certainly was stressful
for Varela and his wife and appears to have colored how they
interpreted what was said, or their memories of that.  Details
reveal the inaccuracies in their testimony, although those
inaccuracies may be the result of mistaken impressions or
emotion, and do not necessarily establish deception.  For
example, Varela heard fear in his wife's voice over the phone.
Ms. Villanti's panic was understandable, but Varela appeared to
the court to be merging her fright with what SA Akeo said, and to
then have concluded that he had to return home, without having
been ordered to do so.  SA Akeo's version is also consistent with
Varela's recollection that SA Akeo thanked him for returning home
and told him at the house that he was free to leave.

          16.  The statement "we have your wife" or "we have
your wife here," even if made by SA Akeo, was part of SA Akeo's
attempt to persuade Varela that he was not joking.  Although
Varela suggested that the words had a threatening tone,
Ms. Villanti was clearly not being held hostage.  Put in context,
the words, assuming they were said, were not sinister at all.  SA
Akeo was telling Varela that Ms. Villanti was with the agents so
that Varela could speak to Ms. Villanti to determine that the
call was not a prank.  The statement was allegedly made
immediately before SA Akeo handed the phone to Ms. Villanti.
Thus, "we have your wife" or "we have your wife here" meant "here
is your wife" or "I'll put your wife on the phone."  When Ms.

Villanti got on the phone, she told Varela that "the FBI" was at the house, as she recalled that SA Akeo had identified himself as being with the FBI. This detail confirms the flaws in her recollection, as SA Akeo certainly knew he was an ICE agent and had no reason to misidentify his agency.

17.    David was told that he could leave the house if he wanted, but that if he did, he could not return until after the search had been completed. SA Akeo says he told Ms. Villanti the same thing, but she denies having been so informed. Both David and Ms. Villanti stayed at the house.

18.    While Varela was on his way home, and in Ms. Villanti's presence, agents asked David if he was willing to be interviewed, and he indicated that he was. David asked to be interviewed in his bedroom because he had to get ready for school. He told the agents that there were four computers in the house, and that all were inoperable except the Apple IMAC that was downstairs. He explained that he and Varela were the primary users of the computer, and that Varela had taught him how to use Limewire. David used Limewire to download music, which he stored in a folder called "David." David's interview lasted from approximately 6:30 a.m. until 6:50 a.m., at which time David left to go to school.

19.    As long as an agent accompanied her, Ms. Villanti was free to walk throughout the residence. She agreed to be interviewed in her bedroom. She told the agents

10

that she did not know how to use the computer. Her interview
lasted from approximately 6:55 a.m. until approximately 7:15 a.m.

20. Varela arrived home around 7:12 a.m. SAs
Akeo and Jim On introduced themselves to him and said they were
executing a search warrant. SA Akeo told Varela that he could
leave the house if he wanted, but that, if he left, he could not
return until the search was completed. SA Akeo asked Varela if
he was willing to speak with the agents, and Varela said that he
was, but that he wanted to speak away from his wife and stepson.

21. Varela and Ms. Villanti testified that, when
Varela returned home, the agents let him see each other for a few
seconds but did not, at that point, let them speak to each other.
They differ from SA Akeo about what happened next. According to
Varela, he and the agents went downstairs to a level below the
main floor, where, in response to questions regarding the
location of the computer equipment that was the subject of the
search warrant, he showed the agents his computers, removable
drives, and CDs. Ms. Villanti similarly testified that she saw
Varela and the agents go downstairs to a level below the main
floor. SA Akeo, by contrast, testified that he did not go
downstairs to the basement at any time that day. He denied
having asked Varela about the computer equipment while in the
downstairs room.

22. Because the Government is claiming that
Varela did not show the agents the location of the computer

11

equipment, the Government is not expecting to offer at trial any statements Varela claims to have made in the basement. In any event, this court believes SA Akeo on this point. By the time Varela arrived home, the agents had been at the house for over an hour. In that time, David had already told them where to find the computer, so they did not need Varela to show them where to go. They came prepared with <u>Miranda</u> material, so clearly they intended to inform Varela of his rights. There is no suggestion that the scene was one of such chaos or disarray that they initially overlooked the <u>Miranda</u> issue. Moreover, SA Akeo's demeanor on the witness stand was such that this court credits his version as to this point over that provided by Varela and Ms. Villanti, whose memories may be clouded by mistaken impressions of events, stress, or emotion.

23.     The parties agree that, beginning about 7:18 a.m., SAs Akeo and Jim On and Varela did have a discussion upstairs in the guest bedroom shown in Exhibit 1. There, Varela sat on the love seat, SA Akeo sat on the sofa, and SA Jim On sat on a chair. Varela read the search warrant and stated his full name. He said that he had been living on Maui since 1996. SA Jim On then advised Varela of his <u>Miranda</u> rights, using Exhibit 2, a preprinted "Statement of Rights" form that SA Jim On read out loud verbatim. The form told Varela that he did not have to speak, that anything he said could be used against him, and that he had a right to have a lawyer present before and during

12

questioning.  SA Jim On also told Varela that, if he wanted a lawyer but could not afford one, a lawyer would be appointed for him before any questioning proceeded.  Varela said that he understood these rights.  SA Jim On asked Varela to initial each line of the form, and Varela did so.

24.  SA Jim On then read the "Waiver of Rights" section of Exhibit 2 to Varela.  That section confirmed that Varela had read his rights, understood them, and was willing to answer questions without a lawyer being present.  SA Jim On asked Varela whether he wanted to waive his rights.  Varela paused to consider the matter and asked if he should consult with somebody. SA Akeo responded that it was Varela's choice and that the agents could not tell Varela what to do.  Varela asked where the investigation would lead, and the agents said their job was to gather evidence so that a prosecutorial decision could be made. Varela understood them to mean that they would continue their investigation even if he chose not to be interviewed.  Varela then reread the "Statement of Rights," the search warrant, and the list of items to be seized.  He stated, "I know what's on the computer."  Then, at approximately 7:58 a.m., forty minutes after going upstairs, he signed the "Waiver of Rights" section of the form and the agents counter-signed.

25.  Although the agents were armed, they never brandished their weapons.  They told Varela that he was free to leave or to reschedule the interview for a time later that day.

13

Varela was tired after working a night shift but preferred to be interviewed on the spot. The circumstances of his interview indicate that his waiver of his rights was knowing and voluntary.[4]

26. The agents then interviewed Varela from approximately 7:58 a.m. SA Akeo says the interview ended at approximately 9:20 a.m., while Varela says it ended half an hour later.

27. During the interview, Varela said that he was the only person who had full access to the computer and that he had been using Limewire for approximately two years and was very familiar with its operations. Varela explained that Limewire allows users to share files, by both uploading and downloading. He said Limewire had a search tool that could be used to find particular files, and that he used Limewire to knowingly download child pornography by clicking on file titles generated as a result of his search requests. He said that, when he clicked on

---

[4] To the extent Varela is arguing that he felt compelled to answer questions because he had already shown the agents the location of the computers and related equipment, that argument is unpersuasive. Even assuming that Varela began by showing the agents the computer equipment listed in the search warrant or told the agents the location of that equipment, the possible coercive effect of that initial act or statement on later statements was overcome when the Government informed Varela of his rights and obtained his knowing and voluntary waiver of those rights. Simply put, Varela is not credible to the extent he is asserting, under the circumstances of this case, that, despite the Miranda warnings, he felt compelled to answer the Government's questions merely because he had allegedly already shown the agents the location of items listed in the search warrant.

14

a file, Limewire automatically downloaded the file to his computer. Varela said an examination of his computer would probably reveal search terms such as "pedo" and "teen." He said his use of child pornography was "strictly visual, and not tactile." He said that he did not inappropriately touch children and that he thought the children depicted in the files faced "many years of therapy." Varela said he had several hundred images of child pornography in a folder labeled "young," and that he had files labeled "Baby J" that he thought made up a series. Varela had the file-sharing mechanism on Limewire turned on to allow other Limewire users to access and download the files from his computer.

28.    Using a laptop computer that agents had brought to the scene, SA Akeo showed Varela the five videos that SA Rochford had downloaded from Varela's computer by using Limewire. Varela said that two of the videos were on his computer, two of the videos were not on his computer, and the fifth video might have been deleted from his computer.

29.    During the interview, Varela was allowed to use the bathroom, drink water, and go downstairs to speak with his wife. Agents did not accompany Varela into the bathroom, but asked him to leave the door open while he used the bathroom. They accompanied him downstairs because they knew that the kitchen had knives and other potential weapons. Varela offered the agents food and drink.

15

30.   Before leaving the residence that morning, the agents gave Varela a copy of the search warrant and a list of the items that had been seized.

B.   CONCLUSIONS OF LAW.

Varela argues that the child pornography found on his computer should be suppressed for two reasons.  First, he says that SA Rochford should have obtained a warrant to view the files that Varela had made available via Limewire.  Second, Varela says that the Government needed a warrant to get information from Road Runner identifying the person who had the internet account for the computer with the child pornography that was being shared through Limewire.  Alternatively, Varela argues that the Government should have used a subpoena, rather than a summons, to request information from Road Runner.  Varela also argues that his statements to SAs Akeo and Jim On should be suppressed because they were obtained through the use of improper holding and questioning.  These arguments are unpersuasive.

Accessing of Shared Files

1.   Varela initially argues that the Government should have obtained a warrant to view the files he was sharing via Limewire.  This argument is meritless, as Varela did not have a legitimate expectation of privacy in the files he made publicly available.  "To invoke the Fourth Amendment protections, a person must show that he had a legitimate expectation of privacy."
United States v. Shryock, 342 F.3d 948, 978 (9th Cir. 2003),

16

cert. denied, 541 U.S. 965 (2004), citing Smith v. Maryland, 442 U.S. 735, 740 (1979).  To show a legitimate expectation of privacy, a defendant must show: (1) that he had an actual (subjective) expectation of privacy, and (2) that the expectation of privacy is one that society is prepared to recognize as objectively reasonable.  Katz v. United States, 389 U.S. 347, 361 (1967).

   2. Varela did not testify or even allege that he had an actual expectation of privacy as to his shared files.  He therefore fails to meet the first prong of the Katz test.

   3. Even assuming Varela had a subjective expectation of privacy, Varela fails on the second prong of the Katz test because such an expectation would not be objectively reasonable.  "[I]f an individual subscriber opens his computer to permit others, through peer-to-peer filesharing, to download materials from that computer, it is hard to understand just what privacy expectations he or she has after essentially opening the computer to the world."  In re Verizon Internet Servs., Inc., 257 F. Supp. 2d 244, 267-68 (D.D.C.) (reasoning that an internet user has no expectation of privacy if he or she turns on a computer's file sharing mechanism to share certain files with anyone who is able to gain access), rev'd on other grounds, 351 F.3d 1229 (D.C. Cir. 2003), cert. denied, 125 S. Ct. 309 (2004); United States v. Kennedy, 81 F. Supp. 2d 1103, 1110 (D. Kan. 2000) (no expectation of privacy in subscriber information); see also United States v.

17

Lifshitz, 369 F.3d 173, 190 (2d Cir. 2004) (noting that, although people have a reasonable expectation of privacy in their computers, "[t]hey may not, however, enjoy such an expectation of privacy in transmissions over the Internet").

4.    Varela used Limewire and turned his computer's file-sharing mechanism on, knowing that it gave all Limewire users access to child pornography files stored on his computer.  Varela no more had a legitimate expectation of privacy in those files than would a person who grows marijuana in his freely visible front yard.  Varela effectively opened up his computer to the world, thereby renouncing any privacy rights he may have had in those files.

5.    Varela cites United States v. Slanina, 283 F.3d 670 (5th Cir. 2002), judgment vacated on other grounds by Ashcroft v. Free Speech Coalition, 535 U.S. 234 (2002), to support his argument that he had a legitimate expectation of privacy in the shared files.  Slanina is distinguishable.  In Slanina, city employees and government agents entered the defendant's office and used the defendant's computer to search its hard drive for pornographic images; the files were not discovered while being shared on a file-sharing network.  See id. at 673.  The court stated, "Given the absence of a city policy placing Slanina on notice that his computer usage would be monitored and the lack of any indication that other employees had routine access to his computer, we hold that Slanina's

expectation of privacy was reasonable." Id. at 677. Varela

offers no evidence that he thought that the child pornography

computer files were private, as he knowingly opened those files

to all members of the public.

Request for Internet Subscriber Account Information

      6.    Varela next argues that the Government should

have obtained a warrant seeking his subscriber information from

Road Runner. This argument is also without merit, as Varela

lacks any legitimate expectation of privacy in the subscriber

information he conveyed to Road Runner. See Guest v. Leis, 255

F.3d 325, 336 (6th Cir. 2001) ("A bank customer, for instance,

does not have a legitimate expectation of privacy in the

information that he or she has conveyed to the bank; by placing

the information under control of a third party, the customer

assumes the risk that the bank will convey the information to the

government. Courts have applied this principle to computer

searches and seizures to conclude that computer users do not have

a legitimate expectation of privacy in their subscriber

information because they have conveyed it to another person--the

system operator. " (citation omitted)); United States v. Cox, 190

F. Supp. 2d 330, 332 (N.D.N.Y. 2002) ("courts have already held

that criminal defendants have no Fourth Amendment privacy

interest in subscriber information given to an internet service

provider"); Kennedy, 81 F. Supp. 2d at 1110 ("Defendant's

constitutional rights were not violated when Road Runner divulged

his subscriber information to the government.  Defendant has not demonstrated an objectively reasonable legitimate expectation of privacy in his subscriber information.").

7.    Varela appears to be arguing that, even if no warrant was required, to obtain his subscriber information, the Government had to "subpoena" Road Runner pursuant to 18 U.S.C. § 2703(c)(2).  That provision states that a provider of electronic communication service shall disclose to a governmental entity various subscriber information "when the governmental entity uses an administrative subpoena authorized by a . . . statute . . . ."  The Government, however, sought the subscriber information through a "summons" authorized by 19 U.S.C. § 1509(a).  Varela does not dispute that ICE was properly investigating child pornography crimes.  Accordingly, § 1509(a) allowed ICE to "summon" Road Runner in Hawaii "to appear before the appropriate customs officer at the time and place within the customs territory of the United States specified in the summons . . . to produce records . . . and to give such testimony, under oath, as may be relevant to such investigation or inquiry."  19 U.S.C. § 1509(a)(2).  ICE therefore properly requested the subscriber information for the computer sharing the child pornography pursuant to § 1509(a).  Even assuming that the Government was also required to comply with § 2703(c)(2), ICE's use of a "summons" under § 1509 was equivalent to a subpoena for

purposes of § 2703(c)(2).  Accordingly, ICE complied with applicable law in obtaining Varela's subscriber information.

8.  Even if the summons procedure was erroneous, it is Road Runner, not Varela, who is aggrieved by what Varela says was the wrong method of obtaining information, especially as Varela had no legitimate expectation of privacy in his subscriber information.  See United States v. Plunk, 153 F.3d 1011, 1020 (9th Cir.), as amended by 161 F.3d 1195 (9th Cir. 1998) (an individual lacks standing to challenge a subpoena issued to a third party unless the individual can demonstrate a legitimate expectation of privacy in the records obtained via the subpoena), abrogated on other grounds by Kumho Tire Co. v. Carmichael, 526 U.S. 137 (2000).

There was no Miranda Violation.

9.  Nor should any evidence be suppressed under Miranda v. Arizona, 384 U.S. 436 (1966).  In Miranda, the Supreme Court established the rule that, when a person is "in custody," procedural safeguards must be afforded that person before the person is questioned.  Otherwise, the prosecution may not use what it learns through its interrogation.  Id. at 444.  This rule was premised on the Fifth Amendment's privilege against self-incrimination.  The Supreme Court reasoned that the privilege against self-incrimination is protected by adequately and effectively advising an individual of his or her rights.  See id. at 467.

21

10.   "An officer's obligation to give a suspect Miranda warnings before interrogation extends only to those instances where the individual is 'in custody'." United States v. Kim, 292 F.3d 969, 973 (9th Cir. 2002).  If discomfort alone were the test for determining whether someone was in custody, the police would have to give Miranda warnings every time they spoke to anyone, even during something like a jaywalking stop.  Miranda did not go that far.  The Ninth Circuit has held that, to determine whether a defendant is "in custody," a court should:

> determine whether the officers established a setting from which a reasonable person would believe that he or she was not free to leave. . . . The following factors are among those likely to be relevant to deciding that question:  (1) the language used to summon the individual; (2) the extent to which the individual is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.

Id. at 973-74 (internal quotations and citations omitted).

11.   In this case, the agents had not established a setting in which a reasonable person would have felt forced to stay.  Varela was not present when the agents began the search of his residence.  SA Akeo called Varela and informed him that he could come home if he wanted to, but that Varela was not required to do so.  Varela chose to leave work to return home.  When Varela arrived home, the agents again informed him that he was

22

not required to stay. Varela chose to stay.  Then, when the
agents asked Varela if he was willing to be interviewed, Varela
said that he was willing to answer questions and led the agents
to the place Varela selected for the interview.  During the
interview, which lasted only two or three hours, Varela was
allowed to use the bathroom, drink water, and talk with his wife.
Under these circumstances, Varela was not in custody and the
agents were not required to issue the Miranda warnings.

     12.  Even assuming Varela was in custody, his
Fifth Amendment rights were not violated because he knowingly and
voluntarily waived his Miranda rights.  An accused affirmatively
and effectively waives his or her Miranda rights when the
totality of the circumstances indicates that the waiver was
knowing and voluntary.  Juan H. V. Allen III, 408 F.3d 1262, 1271
(9th Cir. 2005) (holding that the accused waived his Miranda
rights when he was "explicitly informed of his Miranda rights,
and apparently understood" the rights, and "indicated that he was
willing to talk and proceeded to answer questions about the
events"), petitions for cert filed, 74 U.S.L.W. 3248 (Oct. 4,
2005) and No. 05-7510 (Nov. 7, 2005).  Before being given Miranda
warnings, Varela provided biographical information.  After the
agents gave him his Miranda warnings, Varela initialed each of
his rights and signed a waiver of those rights.  See Exhibit D.

23

He was then interviewed.  His statements were therefore not
obtained in violation of Miranda.

        13.  Even assuming that Varela took the agents to
the basement and showed them or told them the location of the
computer equipment sought in the warrant, Varela establishes no
Miranda violation, as he was not in custody at the time.  In any
event, the Government has represented that it will not be
introducing at trial any evidence about what was said or done by
Varela in the basement, as the Government denies that Varela ever
took the agents to the basement.  This is not a case in which the
proverbial bell cannot be unrung.  Under the circumstances of
this case, even if Varela made statements in the basement
regarding the location of his computer equipment, Varela suffered
no psychological or other coercive pressure that was not cured by
the Miranda warnings given to him before the interview started.
These Miranda warnings were sufficient to demonstrate that his
statements during the interview were voluntary.  See generally
Oregon v. Elstad, 470 U.S. 298, 314 (1985) ("We must conclude
that, absent deliberately coercive or improper tactics in
obtaining the initial statement, the mere fact that a suspect has
made an unwarned admission does not warrant a presumption of
compulsion.  A subsequent administration of Miranda warnings to a
suspect who has given a voluntary but unwarned statement
ordinarily should suffice to remove the conditions that precluded

                                24

admission of the earlier statement.  In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.").

The Interrogation of Varela Was Not Unreasonable.

14.    Varela appears to be arguing that the length of his interrogation was unreasonable and that his statements were therefore involuntary.  He claims to have been questioned for four hours in his home, although, at most, the questioning lasted for only about three hours, with breaks being taken so that Varela could use the bathroom, drink water, and speak with his wife.  Under these circumstances, the questioning of Varela was not unreasonable and did not violate any constitutional right.  See United States v. Gamez, 301 F.3d 1138, 1144-45 (9th Cir. 2002) (holding that a 31-hour detention was reasonable and that the defendant's statements were voluntary when the defendant was read his Miranda rights, indicated he understood the rights, signed a written waiver of those rights, was given one glass of water, but was not offered food); accord Clark v. Murphy, 331 F.3d 1062, 1072-73 (9th Cir. 2003) (holding that the defendant's statements were voluntary when the defendant was interviewed in a 6x8 foot windowless room without being given a restroom break or water for more than 5 hours, but had not asked for food, water, or a restroom break); United States v. Williams, 291 F.3d 1180,

1190-91 (9th Cir. 2002) (holding that the defendant's statements during a 45- to 60-minute interrogation were voluntary when the defendant validly waived his <u>Miranda</u> rights, the government agent was polite during the interrogation, and the defendant was not deprived of "food or other necessities"); <u>United States v. Doe</u>, 155 F.3d 1070, 1075 (9th Cir. 1998) (holding that a minor defendant's statements were voluntary when the defendant was not questioned in an oppressive manner and "did not appear to be intoxicated . . . [,] did not request to leave the room for food, water or a restroom [break, and] was not handcuffed").

IV.    <u>CONCLUSION.</u>

  For the foregoing reasons, the motion to suppress is denied.

     IT IS SO ORDERED.

     DATED:    Honolulu, Hawaii, November 23, 2005.

          _____
          SUSAN OKI MOLLWAY
          UNITED STATES DISTRICT JUDGE

**<u>United States v. Varela</u>; CR. No. 05-00221 SOM; ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS.**